**SO ORDERED.**

**SIGNED this 11 day of December, 2012.**



_____
**Stephani W. Humrickhouse
United States Bankruptcy Judge**

_____

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

**CLIFFORD JAMES SAPPAH
DEBRA LYNN SAPPAH**

       **DEBTORS**

CASE NO.

11-03129-8-SWH

## ORDER

The matter before the court is the motion filed by the chapter 13 trustee to dismiss this case because the debtors are ineligible to be chapter 13 debtors pursuant to 11 U.S.C. § 109(e). A hearing took place in Raleigh, North Carolina, on September 19, 2012.

### BACKGROUND

Clifford James Sappah and Debra Lynn Sappah filed a petition for relief under chapter 13 of the Bankruptcy Code on April 21, 2011. On May 4, 2011, the debtors filed their Schedule F, indicating a total of $1,346,007.25 in unsecured nonpriority claims,[1] the largest of which was scheduled as a contingent, unliquidated claim held by First National Insurance Company of America ("First National") in the amount of $1,320,056.00. First National served as a surety in connection

---

[1] The debtors' schedule E indicated $0 in unsecured priority claims.

with various bonds on construction projects of Sappah Brothers, Inc., a contracting company of which the male debtor is an officer. In this regard, First National obtained an indemnity agreement for any related bonds, which was executed by Sappah Brothers, Inc., Sappah Brothers Building, LLC, CAR Builders, Inc., and each debtor as individual indemnitors.[2] Also scheduled were claims in favor of Branch Banking and Trust Company in the amounts of $5,086.00 and $312.74, as well as a claim in an unknown amount for liability related to a foreclosure.

Creditors filed claims for unsecured nonpriority debts in the total amount of $1,944,617.04, including a claim for $1,079,001.21 filed by First National, as well as claims filed by BB&T for $560,573.56 ("Claim No. 8-1") and $284,139.14 ("Claim No. 7-2"). An unsecured priority claim was filed by the Internal Revenue Service in the amount of $131,567.55 (as most recently amended), bringing the total amount of claims for unsecured debts to $2,076,184.59. The debtors filed an objection to the initial claim filed by the IRS, but later withdrew the objection.[3] No other objections to claims have been filed.

## DISCUSSION

The chapter 13 trustee filed a motion to dismiss the debtors' case, contending that they are not eligible to be debtors under chapter 13 because their unsecured debt exceeds the limit set forth in 11 U.S.C. § 109(e). Section 109(e) provides, in relevant part, that

---

[2] The male debtor is also a principal of Sappah Brothers Building, LLC and CAR Builders, Inc.

[3] The IRS claim was initially filed on July 21, 2011, in the amount of $189,106.88, based on a combination of civil penalties and income tax. According to the debtors, the civil penalties arose from tax assessments against Sappah Brothers Inc., an entity of which the male debtor is a principal. The debtors objected to the inclusion of the income tax, and the IRS amended the proof of claim to omit the income tax, reducing the claim amount to $176,846.88 on October 13, 2011. The proof of claim was subsequently amended on December 22, 2011 and February 16, 2012, in the final amount of $131,567.55.

> [o]nly an individual with regular income that owes, on the date of the filing of the petition, noncontingent, liquidated, unsecured debts of less than $360,475 . . . may be a debtor under chapter 13 of this title.

11 U.S.C. § 109(e). Thus, chapter 13 eligibility is determined as of the date the petition is filed. Id., see, e.g., In re Bernick, 440 B.R. 449 (Bankr. E.D. Va. 2010).

As to whether a debt is noncontingent, courts generally hold that "a debt is noncontingent if all of the events necessary to give rise to liability for it take place prior to the filing of the petition." See, e.g., In re Knowles, Case No. 05-06402-8-ATS (Bankr. E.D.N.C. Oct. 31, 2005). The term "liquidated" in the context of § 109(e) has received somewhat varied interpretations among courts; the most common interpretation is that a debt is liquidated if the amount of the debt is easily ascertainable using a simple mathematical calculation. In re Guzman, Case No. 10-10169-8-JRL (Bankr. E.D.N.C. May 31, 2011). Some courts hold that the standard is whether a significant evidentiary hearing would be necessary to determine the amount of the debt. Id.

The trustee contends, and the debtors concede, that the debtors' unsecured debt is noncontingent. In addition, the trustee contends that the debt is liquidated, because claims are considered valid as filed unless successfully contested, and the debtors have not maintained objections to any of the claims filed.[4] If so, the approximate unsecured claim total of $2 million causes the debtors to run afoul of the unsecured debt limit contained within § 109(e). The debtors, on the other hand, contend that the majority of their unsecured debts are unliquidated, and to the extent any of their unsecured debt is liquidated, it totals less than the $360,475 ceiling of § 109(e). At the hearing, the debtors focused on the following four debts, which account for $2,055,281.46

---

[4] See Fed. R. Bankr. P. 3001(f), which provides that "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim."

3

of the unsecured claim total, leaving roughly $20,000 in other unsecured debts which the debtors do not dispute should be included in the § 109(e) unsecured debt calculation:

A.    Claim No. 8-1 of BB&T

BB&T filed Claim No. 8-1, in the amount of $560,573.56, which is identified as a deficiency balance arising from a debt of Pine Glen Developers, LLC. The debtors assert that this claim was unliquidated on the petition date, because it is the result of a foreclosure that was not finalized until after the petition date. Also, as to this particular claim, the debtors contend that the proof of claim does not contain a guaranty agreement and therefore does not establish that either of the debtors are liable for this debt.[5]

Upon a review of the documents attached to the proof of claim, it appears that this claim is based on a promissory note between BB&T and Pine Glen Developers, LLC, which was executed on October 1, 2007 by Clifford Sappah, Richard Sappah, and James W. Post, as managing members of Pine Glen Developers. Also attached to the proof of claim is a deed of trust executed in 2010 by the same parties as well as William J. Post, all in their member/manager capacity of the company. What is not attached to the proof of claim, however, is any sort of guaranty agreement or other document signed by either of the debtors in an individual capacity. Without such, the proof of claim does not constitute prima facie evidence that BB&T is in fact a creditor of the debtors individually on this debt, for purposes of the § 109(e) analysis. This claim amount therefore will not be included in the § 109(e) unsecured debt calculation.

---

[5] For this reason, counsel for the debtors stated at the hearing that this claim is particularly ripe for an objection. However, no such objection has been filed.

B.   Claim No. 7-2 of BB&T

On May 9, 2011, BB&T filed a claim for $905,411.47 ("Claim No. 7-1"), based on a promissory note executed on behalf of CAR Builders, Inc. by Clifford Sappah as Vice President and Richard Sappah as President of the corporation. Clifford Sappah and Richard Sappah further executed a deed of trust on behalf of the corporation, pledging certain real property as collateral for the loan. Copies of the note and deed of trust are attached to the proof of claim, along with a guaranty agreement, which is signed solely by the male debtor in his individual capacity. Other supporting documentation indicates that the $905,411.47 claim amount reflects the balance as of the petition date. Over one year later, on June 15, 2012, BB&T filed Claim No. 7-2 in the amount of $284,139.14, reflecting a principal reduction of $620,000.00, which resulted in a "deficiency balance" of $284,139.14. The debtors assert that this claim was not liquidated on the petition date, because at that point a foreclosure had not yet been finalized.

The guaranty agreement provides that it is a primary obligation, payable on demand, and that BB&T is not required to pursue either the note borrower or any collateral before seeking payment from the male debtor. The agreement further provides that the male debtor shall have no right of subrogation, reimbursement, or indemnity, nor any right of recourse to security for the note borrower's obligations, unless all such obligations are paid in full. In addition, the agreement contains a waiver of any rights or benefits of law that would require BB&T to delay pursuit of the male debtor until it exhausts remedies against the note borrower. Thus, the guaranty agreement is a separate debt instrument from the note and deed of trust, creating a separate obligation of the male debtor, and BB&T is not required to liquidate any collateral or pursue the note borrower before seeking payment in full from the male debtor. See also, In re Smith, Case No. 11-01951-8-JRL at 2

(Bankr. E.D.N.C. Oct. 25, 2011) ("In North Carolina, a personal guarantor is absolutely liable for the underlying debt, without regard for the obligation of other guarantors or obligors to pay the same or related debt.") (citations omitted). As a result, any foreclosure efforts pending at the time of the petition do not affect BB&T's claim against the male debtor individually. As of the petition date, Claim No. 7-1 indicates an unsecured debt of $905,411.47 as to the male debtor. The fact that BB&T later amended its claim, reducing the amount to $284,139.14 has no bearing on the § 109(e) analysis, given that the relevant debt amount is the amount owed as of the petition date. As the uncontroverted initial proof of claim (Claim No. 7-1) establishes that the male debtor owed an unsecured debt of $905,411.47 on the petition date, the male debtor's unsecured debt total exceeds $360,475.00, rendering him ineligible to be a chapter 13 debtor pursuant to § 109(e).

C.      Claim of the Internal Revenue Service

As to the claim filed by the IRS, the debtors state that this claim arises from civil penalties, and that the IRS has also filed a claim in the Sappah Brothers, Inc. case for the same or related civil penalties. The debtors contend that this claim is unliquidated because the IRS is secured by certain collateral that was unliquidated as of the date of the petition, and because the IRS has amended the claim three times since the initial claim was filed in July of 2011, which demonstrates the uncertain nature of the claim amount. In addition, the debtors assert that the claim is subject to reduction in an unknown amount, given that the male debtor's brother and sister-in-law, Richard and Joann Sappah, are debtors in a chapter 7 case and a portion of the proceeds of the sale of their residence will go to the IRS, thereby reducing the amount owed by the debtors in the instant case.

The initial proof of claim filed on July 21, 2011 includes several taxes assessed for "civil penalties," in association with the male debtor's social security number. Also included are two

amounts attributable to income tax for tax year 2010, one under each debtor's social security number. The debtors' objection to claim stated that the debtors filed income tax returns for the year in question, and expected a refund. As such, the debtors sought a reduction in the claim by $12,260.00, the amount of income tax assessed, for a claim amount of $176,846.88. On October 13, 2011, the IRS amended the proof of claim to $176,846.88, changing the amount due for income taxes to $0. Since this reduction involves the debtors' income tax liability for 2010, incurred pre-petition, as well as a corresponding tax refund, it affects the amount due on the date of the petition and is not a post-petition reduction in the amount owed.[6]

It is unclear from the record whether this debt is an obligation of both debtors, or the male debtor only. The debtors bear the burden of establishing eligibility pursuant to § 109(e). In re Bernick, 440 B.R. 449 (Bankr. E.D. Va. 2010). The evidence suggests that both debtors are obligated, in that the proof of claim does not state otherwise and the debtors have not asserted otherwise. To the contrary, their objection to claim states that the "debtors" object to the claim and "the debtors pray that said unsecured priority claim of the Internal Revenue Service be reduced to $176,846.88." Obj. to Claim, Doc. No. 24. It therefore appears that both debtors are obligated on

---

[6] The proof of claim was subsequently amended two more times, apparently to reflect reductions in the civil penalties assessed, beginning with the oldest dated penalties. There is no indication that these changes were corrective measures; instead the reductions are perhaps the result of post-petition developments, such as credits for the liquidation of collateral. Post-petition developments may be considered in the § 109(e) analysis, but *only* to the extent they shed light on the amount of debt owed on the petition date. In re Hatzenbuehler, 282 B.R. 828 (Bankr. N.D. Tex. 2002). As the later amendments to the proof of claim appear to be the result of post-petition developments, these amendments are not relevant to the § 109(e) analysis. See, e.g., In re Lamar, 111 B.R. 327 (D. Nev. 1990) (holding that the § 109(e) calculation is made as of the date of the petition filing; "subsequent activities do not affect how much was owed on that date").

this debt and that the second proof of claim was filed to correct errors in the first proof of claim, such that the amount owed on the petition date was $176,846.88.

As to the debtors' argument regarding the potential future reduction in the debt amount if certain collateral is liquidated, the court finds that because the collateral was not liquidated as of the petition date, its existence and potential future liquidation is not relevant for purposes of § 109(e). Moreover, the IRS claim is based on civil penalties that apparently arose from assessments against Sappah Brothers for unpaid federal withholding taxes, Federal Insurance Contributions Act taxes, and Federal Unemployment Tax Act taxes. Claim No. 6-1, Case. No. 11-08250-8-SWH. Based on Sappah Brothers' failure to pay these taxes, the IRS may collect the full amount due from those responsible for the corporation's failure to pay the taxes. Chaffee v. IRS (In re Chaffee), 186 B.R. 783, 788 (Bankr. N.D.N.Y. 1995). Importantly, a responsible person's liability is "separate and distinct from that imposed on the corporation." Id. The debtors, therefore, were liable for the full amount due on these penalty taxes as of the petition date. Should the male debtor's brother's residence be liquidated post-petition, the amount ultimately owed by the debtors will be reduced, but because they were liable for the full debt as it existed on the petition date, the potential liquidation of collateral of another is not relevant to the § 109(e) analysis. Thus, with the inclusion of the debt owed to the IRS, the male debtor's running unsecured debt total is over $1 million, and the female debtor is within the § 109(e) limit, at least until the final debt at issue is considered below.

D.   Claim of First National Insurance Company of America

The debtors assert that the largest claim filed for an unsecured debt, that of First National in the amount of $1,079,001.21, is unliquidated because it is the subject of a pending district court lawsuit involving not only the debtors in the present case, but also other individual debtors related to the male debtor, and several entities that are in bankruptcy and in which the debtors have an interest. According to the debtors, both factual and legal disputes exist with regard to the claims raised in the complaint filed by First National,[7] resulting in the debtors' filing of a substantial answer in the proceeding. As such, the debtors argue that the claim is the subject of a non-frivolous dispute, and a significant evidentiary hearing would be required to determine the amount of the claim. In addition, the debtors assert that First National is secured by certain collateral, which was unliquidated as of the date of the petition. The debtors represent that a list of the collateral is contained within a June 18, 2012 consent order entered in the Sappah Brothers, Inc. case, and that only recently an item of collateral was sold for approximately $69-70K, but as of the petition date, the value of the collateral was unknown. For these reasons, the debtors contend that the claim of First National is unliquidated and should not count toward the § 109(e) unsecured debt calculation.

An exhibit to the proof of claim indicates that First National's claim amount reflects the total amounts paid out by First National on payment and performance bonds as of the petition date, as well as loss adjustment expenses and amounts attributable to pending claims. The exhibit further includes credits for reimbursement payments received. Although the debtors assert that both the pending status of the district court litigation and the extent to which the complaint is disputed render the amount of the debt unliquidated, the court is not persuaded. The fact that a claim is in dispute

---

[7] The claim, however, was not scheduled as "disputed."

does not exclude it from the § 109(e) analysis, if it is found to be noncontingent and liquidated. In re Claypool, 142 B.R. 753, 755 (Bankr. E.D. Va. 1990); see, e.g., In re Mitrano, 2008 Bankr. LEXIS 4177 (Bankr. E.D. Va. 2008) (holding that even vigorous dispute as to liability on a debt does not exclude the debt from the § 109(e) analysis on the basis of the dispute alone). "To hold otherwise would allow debtors to bootstrap themselves into chapter 13 eligibility simply by disputing liability on the requisite amount of their claims." Claypool, 142 B.R. at 755. Similarly, the existence of a pending lawsuit does not automatically exclude a debt from the § 109(e) calculation. Numerous types of debts are the subject of non-frivolous litigation and discovery, but the mere fact that a debtor disputes the debt does not mean the debt does not count in determining eligibility under § 109(e), as the statute does not exclude disputed debts – only contingent and unliquidated debts are excluded. Although some causes of action, such as those based in tort and quantum meruit, are generally considered unliquidated until judgment is rendered or the damages are otherwise fixed, contract debts tend to be liquidated even though disputed, because the amount owed can be determined from the contract and supporting documents. See, In re Pulliam, 90 B.R. 241 (Bankr. N.D. Tex. 1988).

In determining whether the amount owed is easily ascertainable, such that the debt is liquidated, it is enough that a minimum claim amount can easily be determined. In re Knowles, Case No. 05-06402-8-ATS (Bankr. E.D.N.C. Oct. 31, 2005). In the present case, many claims and counterclaims have been raised in the district court action, but the proof of claim establishes that First National made multiple bond payments in connection with Sappah Brothers projects, and now claims those amounts are owed by the debtors pursuant to the indemnity agreement executed by each

10

debtor. The bond payments and related expenses alone total $1,040,961.71,[8] far in excess of the $360,475 unsecured debt limit of § 109(e). These bond payments establish at least a minimum claim, regardless of additional pending claims in the district court lawsuit.

As to the debtors' arguments regarding unliquidated collateral, the indemnity agreement provides that First National may enforce the agreement directly against the debtors without first proceeding against the contractor, and the debtors waived all rights of indemnity, subrogation, and contribution against Sappah Brothers until all obligations are satisfied in full. The agreement does not contain any requirement that First National liquidate collateral before seeking payment in full from the debtors. As a result, the existence of unliquidated collateral on the petition date does not affect the § 109(e) analysis. Additionally, it makes no difference whether collateral exists or not, because in signing the indemnity agreement, the debtors agreed to be jointly and severally liable with Sappah Brothers Inc., Sappah Brothers Building, LLC, and CAR Builders, Inc. for the repayment of any amounts paid by First National as a surety on Sappah Brothers' contracts. See Crain & Denbo, Inc. v. Harris & Harris Constr. Co., 252 N.C. 836, 839-40 (N.C. 1960) ("'In the case of a joint and several obligation, under both the common law and the modern practice statutes, the plaintiff at his option or election may sue each obligor separately or all of them jointly.'") (citation omitted). As a result, although some future liquidation of collateral owned by Sappah Brothers may reduce amount of the debt owed, until that happens, First National may pursue the debtors for the full amount due, and the amount due as of the petition date is the only amount relevant to the § 109(e) determination.

---

[8] This number does not include $38,039.50 in "pending" claims, but does reflect credits for any amounts paid to First National by Sappah Brothers or others.

Based on the foregoing, both debtors exceeded the unsecured debt limit as of the petition date. The debtors are therefore ineligible to be debtors under chapter 13 pursuant to § 109(e). The motion to dismiss is **ALLOWED.** The debtors may convert their case to chapter 7 within 10 days of the date of this order. If no notice of conversion is filed, the case will be dismissed without further hearing.

**SO ORDERED**.

**END OF DOCUMENT**